IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CAPITOL PAYMENT SYSTEMS, INC., *Plaintiff*, | |
| v. | Civil Action No. ELH-16-882 |
| SALVATORE DI DONATO, *et al.* *Defendants.* | |

## MEMORANDUM OPINION

This Opinion resolves the defendants' motion to transfer this case to the District of New Jersey.

On February 1, 2016, Capitol Payment Systems, Inc. ("Capitol" or "CPS"), plaintiff, filed a "Complaint For Injunctive Relief" in the Circuit Court for Anne Arundel County against defendants Pinnacle Processing Services, LLC ("Pinnacle") and Salvatore Di Donato, the owner and president of Pinnacle. ECF 4. Capitol asserts a claim for breach of contract (Count I) (*id.* ¶¶ 33-40) and a claim for tortious interference with contractual relations (Count II). *Id.* ¶¶ 41-51.[1] Pinnacle removed the case to this Court on March 23, 2016, asserting diversity jurisdiction. *See* 28 U.S.C. §§ 1332, 1441, and 1446. ECF 3 at 1.

Pursuant to a joint motion (ECF 24), this case was stayed by Order of May 20, 2016 (ECF 26), pending mediation in a related case initiated by Pinnacle and Di Donato on February 25, 2016, in the District of New Jersey. *See, e.g.*, ECF 26; ECF 40; *see also Pinnacle Processing*

---

[1] The counts are imprecise in identifying the party or parties to whom or to which they apply. Each refers to an unspecified "Defendant." *See, e.g.*, ECF 4 at 9 (In Count II, stating "Defendant intentionally and improperly interfered . . . ."). Yet, relief is sought from both defendants for each count. In context, it would appear that Count I applies to Pinnacle and Count II applies to Di Donato.

*Services, LLC et al. v. Capitol Payment Systems, Inc., et al.*, Case No. 3:16-CV-01084-FLW-DEA (D. N.J.). The mediation was unsuccessful. *See* ECF 39.

Defendants have moved to transfer the case to the United States District Court for the District of New Jersey, pursuant to 28 U.S.C. § 1404. ECF 43. The motion is supported by a memorandum of law (ECF 43-1) (collectively, "Motion") and several exhibits. ECF 43-2 through ECF 43-6. Capitol responded in opposition (ECF 44, "Opposition), with exhibits. ECF 44-1 through ECF 44-10. Defendants have replied. ECF 45 ("Reply").

The Motion has been fully briefed and no hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion.

## I.    Factual Background[2]

Capitol is a Maryland corporation with its principal place of business in Anne Arundel County. ECF 4, ¶ 3. It is a "merchant services company" that provides payment transaction processing services "to a wide array of merchants including small business, regional and national chains, associations, agent banks, fuel merchants and government agencies along with many others." *Id.* ¶ 6. Capitol's business includes "processing point of sale credit, debit, [and] gift card transactions for retail merchants and banks." *Id.* ¶ 7. Robert Schoenbauer is the president of Capitol. ECF 44-5 (Schoenbauer Affidavit), ¶ 2. He is not a party to this case.

Pinnacle is a single member limited liability company formed under the laws of New Jersey, with its principal place of business in Red Bank, New Jersey. ECF 4, ¶ 5; ECF 43-5, ¶¶ 3-5 (Di Donato Declaration of 3/31/2016), ¶¶ 3-5.[3] Di Donato is the president, owner, and

---

[2] Given the procedural posture of the case, I shall present the facts asserted in the Complaint, as supplemented by other submissions.

[3] In the Complaint, Capitol alleges that Pinnacle is "incorporated in the State of New Jersey . . . ." ECF 4, ¶ 5. However, in his Declaration of March 31, 2016, Di Donato states:

operator of Pinnacle.  ECF 4, ¶ 4; ECF 43-4 (Di Donato Declaration of 3/7/2016), ¶ 3.  Formed in 2008, Pinnacle operates as "an agent in the electronic payment processing industry . . . [that] works on behalf of Independent Sales Organizations . . . ."  ECF 43-3, ¶ 4.

I pause to review briefly aspects of the credit card payment processing industry that frame this case.  According to defendants, "[w]hen merchants offer debit and credit card payment services to consumers, they generally do so with the assistance of entities that act as intermediaries between merchants and electronic payment processors.[]"  ECF 43-1 at 5. Payment processors "often contract with entities known in the payments industry as Independent Sales Organizations ("ISOs") . . . , [which] acquire merchant relationships on behalf of the processors" and provide various other services.  *Id.*

"ISOs, in turn, commonly associate themselves with merchant-level agents: entities or individuals that seek out new merchant relationships on behalf of the ISOs and otherwise facilitate the relationships between merchants and ISOs."  *Id.*  Agents are typically compensated through ongoing monthly payments known as "residuals."  *Id.*

On or about July 17, 2008, Di Donato entered into an "Independent Marketing Agreement" ("Agreement") with Capitol.  ECF 4, ¶¶ 4, 9; ECF 44-1 at 17-26 (Agreement).[4]  Di Donato states that he signed the Agreement in New Jersey and e-mailed the signed copy to Schoenbauer.  ECF 43-5, ¶ 10.  In its Opposition, Capitol states: "Pinnacle signed the Agreement in Florida and returned the signed Agreement to Capitol in Maryland."  ECF 44 at 10.

---

"Pinnacle is a single member LLC . . . duly organized and existing under the laws of New Jersey, and maintains its only offices in New Jersey."  ECF 43-5, ¶¶ 4-5.

[4] At the time, Pinnacle had not yet been incorporated.  ECF 4, ¶ 4.  Pinnacle was incorporated in November 2008.  *Id.* ¶ 5.

Nevertheless, the disagreement as to where Pinnacle signed the Agreement is of no consequence, as the parties seem to agree that Pinnacle did not sign the Agreement in Maryland.

According to CPS, under the Agreement, defendants "agreed to act as an agent of CPS and solicit prospective merchants to apply to CPS for merchant agreements and otherwise provide various merchant account and processing services to the 'merchants.'" ECF 4, ¶ 10.

Paragraph 4(c) of the Agreement provides, ECF 44-1 at 19-20:

> **(c) Non-Interference** So long as any Merchant Agreement of any merchant solicited by Agent remains in effect, and for a period not to exceed five years after such date, Agent shall not interfere in any manner whatsoever with the contractual rights and interests of CPS under any such Merchant Agreement, either directly or indirectly (including without limitation, through any partnership, joint venture as an employee or other entity or arrangement[)] to engage in bank card transaction processing through any person or entity other than CPS. Agent may not contact bank or processor directly in an effort to buy pass [sic] CPS or attempt to go direct in any way. Agent may not develop a direct relationship with bank or processor in any way regardless of initiation directly or indirectly. If Agent violates the provisions of this Subparagraph 4(c), by its own acts, or in collusion with any other person or entity, then all payments due to Agent hereunder shall immediately cease and CPS shall have no further obligation to make any such payments and shall be entitled to all other remedies it may have under this Agreement or applicable law. The covenants of Agent and all other provisions of this Subparagraph 4(c) shall survive termination of this Agreement.

Paragraph 5 of the Agreement is titled "COMPENSATION OF AGENT." ECF 44-1 at 20. Paragraph 5(a), titled "Processing Fees", provides, *inter alia*, *id.*: "Agent shall be entitled to a fee which is derived from discount fees on gross sales and which is paid to CPS for each merchant solicited by Agent and approved by CPS. Agent shall be entitled to receive compensation . . . for so long as CPS is receiving corresponding compensation for such approved merchant . . . ." (Internal quotations omitted).

Paragraph 13 of the Agreement pertains to the use of proprietary information. *Id.* at 23-24. It defines "proprietary information" as "all printed and written material, application forms, contracts and other information furnished by CPS to Agent." *Id.* at 23. With respect to

proprietary information, the Agreement provides, in pertinent part, *id.*: "Agent shall not use or disclose any of CPS proprietary information to any other person or entity during the term of this Agreement and for three (3) years thereafter."

Notably, paragraph 17 is titled "GOVERNING LAW". *Id.* at 24. It provides, *id.*: "This Agreement and all the documents referred to herein, shall in all respects, be interpreted, enforced and governed by and under the laws of the State of Maryland."

In or around June 2012, the parties became involved in a dispute concerning defendants' residual commission percentage. ECF 4, ¶ 13. At the time, defendants threatened to move to another provider the accounts that had been brought to Capitol. *Id.* To retain Pinnacle as an independent contractor, Capitol agreed to increase defendants' commission for new business. *Id.*; *see* ECF 44-1 at 27 (Addendum to Agreement). Nevertheless, defendants began "selling" for a competitor, Priority Payments Local ("Priority"), and other merchant services providers. ECF 4, ¶ 13.

In or around the fall of 2015, defendants allegedly "began soliciting various CPS customers and encouraging those customers to terminate their merchant agreements with CPS." *Id.* ¶ 15. Defendants also directed some of CPS's customers to Priority. *Id.* According to Capitol, defendants "developed a scheme by which [they] solicit an existing CPS account, move[] that account to Priority, and then approximately one month later request[] that the account be closed with CPS." *Id.* ¶ 16. Capitol alleges, on information and belief, that defendants "tell these account holders that CPS is considering selling its portfolio of accounts, thereby implying that CPS is no longer stable or viable." *Id.* ¶ 17. Further, Capitol alleges, on information and belief, that defendants tell the account holders that Capitol "is running a fraudulent operation and is getting sued." *Id.* ¶ 18.

Capitol points to a variety of businesses that had an account with Capitol but have since moved to Priority. *See id.* ¶¶ 22, 23, 25, 27, 29, 30. It also points to several other businesses that have either left or considered leaving Capitol. *See id.* ¶¶ 24, 26, 28, 31, 32.

Di Donato avers that on January 19, 2016, he received a letter from Capitol's counsel "purporting to terminate the Agreement based on alleged (and unspecified) breaches by Pinnacle." ECF 43-4, ¶ 16; *id.* at 24-26. The letter, dated January 19, 2016, stated, *id.* at 24 (emphasis in original):

> Please be advised that it appears as though Pinnacle has violated, and continues to violate, the Agreement in a variety of respects which include, but upon information and belief are not limited to, material breaches of paragraph 4(c) of the Agreement which explicitly prohibits interference "in any manner whatsoever with the contractual rights and interests of CPS under any such Merchant Agreement..."

> Indeed, my client has reason to believe that Pinnacle is and has been soliciting various CPS customers to cease doing business with CPS and otherwise terminate their Merchant Agreements. Some of these customers have already confirmed as much.

>         \*      \*      \*

> Given all of the foregoing, please be advised that, as a result of Pinnacle's substantial and material breach of the Agreement, the Agreement is hereby <u>TERMINATED</u>. **Furthermore, pursuant to paragraph 4(c) and all other applicable provisions in the Agreement, all payments due to Pinnacle under the Agreement shall immediately cease.**

>         \*      \*      \*

> CPS reserves all rights at law, in equity and in contract including, but not limited to, the right to immediately institute legal proceedings against Pinnacle which action(s) may include emergency injunctive relief prohibiting Pinnacle's continuing violations of the Agreement and other improper activities adverse to CPS. CPS will seek reimbursement of it's [sic] reasonable attorney's fees as part of any such action.

Counsel for Pinnacle responded to Capitol by letter dated January 22, 2016. ECF 43-4, ¶ 18; *id.* at 28-29. The letter of January 22, 2016 stated, in pertinent part, *id.* at 28-29 (emphasis in original):

> The thrust of your letter appears to be a claim that Pinnacle breached Section 4(c) of the Agreement. The relevant language in that Section is that "Agent *shall not interfere* in any manner whatsoever with the contractual rights and interests of CPS under any such Merchant Agreement… (emphasis added)." In fact, Pinnacle has in no way interfered with any CPS merchant or Merchant Agreement. And your letter is devoid of specific allegations to the contrary. Conclusory and vague assertions that merchants have switched processors – which could happen for any number of reasons – or that there were "other improper activities" cannot satisfy any legally or commercially reasonable definition of interference.
>
> * * *
>
> The failure to timely pay Pinnacle would result in irreparable harm to its business. Section 6 of the Agreement provides for such payment by the 30th day of each month. Based upon the lengthy course of dealing between the parties, CPS typically makes such payments by the 25th day of each month. Pinnacle will not sit idly by while CPS improperly withholds compensation payable to Pinnacle pursuant to the Agreement.
>
> To be clear, if Pinnacle does not receive payment in full by **January 29, 2016**, we will commence litigation on behalf of Pinnacle in an appropriate jurisdiction and venue. Pinnacle's claims would potentially include, among others, breach of contract, fraud, breach of the duty of good faith, unjust enrichment, tortious interference, a demand for accounting and equitable relief.

Di Donato maintains that Pinnacle never received a response to the letter of January 22, 2016. ECF 43-4, ¶ 18. But, according to Di Donato, at some point after Pinnacle's letter of January 22, 2016, Pinnacle lost access to an online system called "E-Merchant View", which allows it to track the status of merchant accounts that it brought to Capitol. *Id.* ¶ 19.

Di Donato then directed counsel to send a second letter to counsel for Capitol. *Id.* ¶ 20; *id.* at 31-32. That letter, dated January 27, 2016, provided, in pertinent part, *id.* at 31 (emphasis in original):

CPS's actions constitute a material breach of the Agreement. This correspondence shall serve as written notice of CPS's material breach in accordance with Section 10(a) of the Agreement. As such, CPS's failure to cure this breach within five (5) days of the date hereof shall constitute grounds for immediate termination of the Agreement. To be clear, the Agreement will terminate as of <u>February 2, 2016</u> if Pinnacle's access to E-Merchant View is not fully restored by February l.

\*       \*       \*

We reiterate our demand that CPS immediately pay Pinnacle its monthly compensation in full. CPS must also immediately restore Pinnacle's access to E-Merchant View to ensure that all merchants receive proper and timely customer service. If CPS does not alter its present course, not only will it face costly litigation, but its improper actions will result in accelerated merchant attrition.

## II.    Procedural History

### A. Circuit Court for Anne Arundel County

As noted, Capitol filed suit against defendants in the Circuit Court for Anne Arundel County on February 1, 2016. ECF 4. At the same time, Capitol filed a motion for a temporary restraining order ("TRO") and preliminary injunctive relief. ECF 5. Defendants "made a limited, special appearance before the Maryland court on February 2, 2016" to respond to the TRO. ECF 43-1 at 10. The circuit court denied the TRO by Order of February 3, 2016. ECF 6. However, the court's order provided that "a Preliminary Injunction hearing shall be set in within thirty-five days . . . ." *Id.* It appears that the hearing was set for March 9, 2016. ECF 8. However, Capitol withdrew its motion for preliminary injunction, without prejudice, on March 1, 2016. *Id.*

Summons was issued on March 3, 2016 (ECF 10) and served on Di Donato and Pinnacle on March 11, 2016. *See* ECF 44-4. As indicated, Pinnacle removed the case to this Court on March 23, 2016. ECF 3.

**B. District of New Jersey**

On February 25, 2016, Pinnacle and Di Donato filed suit against Capitol and Schoenbauer in the United States District Court for the District of New Jersey ("N.J."). ECF 1 in D.N.J. Case No. 3:16-cv-1084-FLW-DEA ("N.J. Case" or "New Jersey Case"); *see* ECF 43-2 (N.J. Case, docket). At the time the New Jersey Case was filed, Pinnacle and Di Donato had not yet been served with process in the Maryland State case. In their Verified Complaint, Pinnacle and Di Donato assert claims, *inter alia*, for breach of the Agreement, defamation, and unjust enrichment. *See* N.J. Case, ECF 1.

In particular, Pinnacle and Di Donato allege that Capitol breached the Agreement by refusing to pay Pinnacle residuals following Capitol's letter of January 19, 2016 (ECF 43-4 at 24-26). N.J. Case, ECF 1, ¶ 37. Moreover, Pinnacle and Di Donato assert that they "learned that CPS and Schoenbauer have been in contact with numerous merchants who entered into Merchant Agreements with CPS as a result of Pinnacle's marketing efforts" (*id.* ¶ 27) and that CPS and Schoenbauer were "providing those merchants with false information." *Id.* ¶ 28. Pinnacle and Di Donato allege, *id.*:

> Schoenbauer has falsely represented that: (1) due to Pinnacle's involvement, the merchants' accounts were not set up correctly; (2) merchants were being charged unnecessarily high rates for their processing services (including the statement, among others, that "Sal is robbing you"); and (3) merchants could save money by terminating the prior contracts facilitated by Pinnacle and entering into new and cheaper contracts with CPS directly.

Further, Pinnacle and Di Donato assert: "The reasons for [Capitol and Schoenbauer's] contacts with these merchants are transparent: CPS is attempting to bypass the contracts arranged by Pinnacle under the Agreement and take for itself the relationships that Pinnacle has cultivated for years, along with the corresponding income . . . ." *Id.* ¶ 33.

Pinnacle and Di Donato filed a motion for preliminary injunction in the New Jersey Case on March 10, 2016. *See* N.J. Case, ECF 4. Capitol and Schoenbauer opposed the motion. N.J. Case, ECF 10. On March 28, 2016, Capitol and Schoenbauer moved to dismiss the case, or alternatively, to transfer venue to the District of Maryland. N.J. Case, ECF 11. Then, by Order of April 7, 2016, Magistrate Judge Douglas Arpert (D.N.J.) granted the applications for pro hac vice admission in the New Jersey Case, filed by Timothy Maloney, Esq. and Joseph Creed, Esq., Capitol's counsel in the Maryland case. N.J. Case, ECF 15.

On May 13, 2016, United States District Judge Freda Wolfson, to whom the New Jersey Case is assigned, ordered the parties to participate in mediation. N.J. Case, ECF 18. In addition, Judge Wolfson deemed the motions pending in the New Jersey Case as withdrawn, without prejudice, and administratively stayed the case pending the outcome of the mediation. *Id.* Notably, Judge Wolfson stated that the New Jersey Case involves "substantially the same parties and dispute" as the case *sub judice*.

In a joint status report submitted to Judge Wolfson on June 29, 2016, the parties stated that on June 22, 2016, they engaged in a mediation conference with the Honorable Joel Rosen, a retired New Jersey state court judge, and that the mediation was expected to continue until at least July 26, 2016. N.J. Case, ECF 19. To my knowledge, nothing further has been docketed in the New Jersey Case. *See* N.J. Case, docket.

## C. District of Maryland

As noted, Pinnacle removed the Maryland State case to federal court on March 23, 2016 (ECF 3), about a month after suit was filed by Pinnacle and Di Donato in federal court in New Jersey. Defendants here, who are plaintiffs in the New Jersey Case, subsequently moved to transfer venue to the District of New Jersey, pursuant to 28 U.S.C. § 1404. ECF 15. Thereafter,

the parties informed this Court that Judge Wolfson would be entering an order directing mediation in the New Jersey case. ECF 21. On May 18, 2016, they jointly moved to stay this case. ECF 24 ("Motion to Stay"). In the Motion to Stay, the parties informed the Court of Judge Wolfson's mediation order (N.J. Case, ECF 18). *Id.* And, defendants agreed to withdraw their motion to transfer (ECF 15), without prejudice. *Id.* I granted the Motion to Stay by Order of May 20, 2016. ECF 26.

By Order of August 3, 2016 (ECF 27), I directed the parties to file periodic status reports with the Court. *See* ECF 27; ECF 29; ECF 31; ECF 33; ECF 36; ECF 38. In the status reports, counsel provided updates as to the progress of the mediation. *See, e.g.*, ECF 28; ECF 30; ECF 32; ECF 35; ECF 37; ECF 39. In a status report submitted on August 12, 2016, the parties stated that they had participated in a mediation conference on June 22, 2016, and that counsel and the mediator held a follow-up conference on August 2, 2016. ECF 28. Thereafter, the parties reportedly continued to engage in informal settlement discussions. *See, e.g.*, ECF 37.

In a status report to the Court on January 5, 2017, the parties indicated that they were unable to reach a settlement agreement. ECF 39. Therefore, they asked the Court to lift the stay. *Id.* By Order of January 5, 2017, I lifted the stay. ECF 40. The Motion followed on February 10, 2017. ECF 43.

### III.    Discussion

As noted, Pinnacle and Di Donato have moved to transfer this case to the District of New Jersey, pursuant to 28 U.S.C. § 1404(a). ECF 43. They argue that New Jersey is a more convenient forum because it is where "the Defendants reside, this dispute arose, the potential witnesses reside, and the bulk of the evidence is located." ECF 43-1 at 2. In addition, defendants point out that New Jersey is "the forum within which [Capitol] agreed to, and did,

litigate a preliminary injunction motion and conducted mediation before a local mediator, a retired New Jersey Superior Court Judge." *Id.*

Capitol disagrees. It contends that, as a Maryland corporation, it is entitled to litigate the case in its home state. ECF 44 at 1. Further, Capitol observes that the Agreement is governed by Maryland law and there are witnesses located in Maryland. *Id*. And, Capitol contends that the first-to-file rule requires the adjudication of the case in Maryland. *Id.* at 2.

## A.

Section 1404(a) of Title 28 of the U.S. Code states, in pertinent part: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." *See also Brigham v. Patla, Straus, Robinson & Moore, P.A.*, 671 Fed. App'x 168 (4th Cir. 2016) (per curiam).

Notably, § 1404(a) "reflects an increased desire to have federal civil suits tried in the federal system at the place called for in the particular case by considerations of convenience and justice." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). To that end, it helps "to prevent the waste 'of time, energy, and money' and 'to protect litigants, witnesses, and the public against unnecessary inconvenience and expense.'" *Id.* (citation omitted). Section 1404 enables the courts to "prevent plaintiffs from abusing their privilege under [28 U.S.C.] § 1391 by subjecting defendants to venues that are inconvenient under the terms of § 1404(a)." *In re: Volkswagen of Am., Inc.*, 545 F.3d 304, 313 (5th Cir. 2008).

A motion to transfer under § 1404(a) "calls on the district court to weigh in the balance a number of case-specific factors." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). These include: "(1) the weight accorded to plaintiff's choice of venue; (2) witness convenience

and access; (3) convenience of the parties; and (4) the interest of justice." *Tr. of the Plumbers and Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015); *see, e.g.*, *Mamani v. Bustamante*, 547 F. Supp. 2d 465, 469 (D. Md. 2008); *Cross v. Fleet Reserve Ass'n Pension Plan*, 383 F. Supp. 2d 852, 856 (D. Md. 2005); *Lynch*, 237 F. Supp. 2d at 617. Other factors include the "local interest in having localized controversies settled at home" and the "appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action." *Stratagene v. Parsons Behle & Latimer*, 315 F. Supp. 2d 765, 771 (D. Md. 2004).

In a motion to transfer venue pursuant to § 1404(a), the moving party bears the burden of showing, by a preponderance of the evidence, that transfer to another venue is proper. *See Gilbert v. Freshbikes, LLC*, 32 F. Supp. 3d 594, 607 (D. Md. 2014); *CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 770 (D. Md. 2009); *Lynch v. Vanderhoef Builders*, 237 F. Supp. 2d 615, 617 (D. Md. 2002). As to hardship on witnesses and parties, in order for the movant to meet its burden, "the movant should submit, for example, affidavits from witnesses and parties explaining the hardships they would suffer if the case were heard in the plaintiff's chosen forum." *Dow v. Jones*, 232 F. Supp. 2d 491, 499 (D. Md. 2002) (citing *Helsel v. Tishman Realty & Constr. Co.*, 198 F. Supp. 2d 710, 712 (D. Md. 2002)). As Judge Blake observed in *Dow*, 232 F. Supp. 2d at 499, where the movant only provides "[m]ere assertions of inconvenience or hardship," it will not adequately have met its burden.

Ultimately, "[t]he decision whether to transfer is committed to the sound discretion of the trial court." *Mamani*, 547 F. Supp. 2d at 469; *see Volkswagen*, 545 F.3d at 312 ("'There can be no question but that the district courts have 'broad discretion in deciding whether to order a

transfer.'"); *see also Plumbing Servs., Inc.*, 791 F.3d at 443; *In re Ralston Purina Co.*, 726 F.2d 1002, 1005 (4th Cir. 1984).

## B.

Under 28 U.S.C. § 1404(a), the "preliminary" inquiry focuses on whether the civil action "might have been brought in the destination venue." *Volkswagen*, 545 F.3d at 312 (internal quotations omitted). In order to satisfy that requirement, venue in the transferee court must be proper, and that court must have personal jurisdiction over the defendant. *D2L Ltd. v. Blackboard, Inc.*, 671 F. Supp. 2d 768, 778 (D. Md. 2009).

Section 1391 of Title 28 of the United Sates Code governs "the venue of all civil actions" filed in federal district court. *Id.*, § 1391(a). Under 28 U.S.C. § 1391(b), venue exists in

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

Section 1391(c) is titled "Residency." Section 1391(c)(2) states:

> [A]n entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question and, if a plaintiff, only in the judicial district in which it maintains its principal place of business(.)

Pinnacle is a limited liability company organized under the laws of New Jersey, with its principal place of business in New Jersey. ECF 43-5, ¶¶ 3, 5. Thus, Pinnacle is subject to personal jurisdiction in New Jersey and is considered a "resident" of New Jersey under 28 U.S.C. § 1391(c). *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (stating

that corporations are subject to "general jurisdiction" in places where they are "fairly regarded as at home").  Di Donato also resides in New Jersey.  *See* 28 U.S.C. § 1391(c)(1); *see also* ECF 43-5, ¶ 6.  Accordingly, the case could have been brought in the District of New Jersey.  28 U.S.C. § 1391(b)(1).

## C.

Having determined that this case could have been brought in the District of New Jersey, the Court must weigh several factors in considering the motion to transfer under § 1404(a).  As stated, these include: (1) the weight accorded to plaintiff's choice of venue; (2) the convenience of the witnesses; (3) the convenience of the parties; and (4) the interest of justice.  *Plumbing Servs., Inc.*, 791 F.3d at 444.

### 1.  Plaintiff's Choice of Venue

"As a general rule, a plaintiff's 'choice of venue is entitled to substantial weight in determining whether transfer is appropriate.'"  *Plumbing Servs., Inc.*, 791 F.3d at 444 (quoting *Bd. of Trs. v. Sullivant Ave. Props., LLC*, 508 F. Supp. 2d 473, 477 (E.D. Va. 1988)); *see also, e.g.*, *Arabian v. Bowen*, 966 F.2d 1441 at *1 (4th Cir. 1992) (per curiam) (table).  Ordinarily, unless the balance of factors points "strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."  *Collins v. Straight, Inc.*, 748 F.2d 916, 921 (4th Cir. 1984); *see Gilbert*, 32 F. Supp. 3d at 607; *Mamani*, 547 F. Supp. 2d. at 469.  This is particularly true where "'the chosen forum is the plaintiff's home or bears a substantial relation to the cause of action.'"  *comScore, Inc. v. Integral Ad Science, Inc.*, 924 F. Supp. 2d 677, 682 (E.D. Va. 2013) (quoting *Pragmatus AV, LLC v. Facebook, Inc.*, 769 F. Supp. 2d 991, 995 (E.D. Va. 2011)); *see also, e.g.*, *Rice v. PetEdge, Inc.*, 975 F. Supp. 2d 1364, 1374 (N.D. Ga. 2013) (recognizing that a plaintiff's choice of venue should be afforded substantial deference where "plaintiff has filed suit

in his home state"); *Sentry Select Ins. Co. v. McCoy Corp.*, 980 F. Supp. 2d 1072, 1077 (W.D. Wis. 2013) ("Because plaintiff . . . has chosen its home forum in which to litigate, its choice is particularly deserving of deference.").

As indicated, a plaintiff's choice of forum "is ordinarily accorded considerable weight . . . ." *Lynch*, 237 F. Supp. 2d at 617. But, "that weight is significantly lessened when none of the conduct complained of occurred in the forum selected by the plaintiff and said forum has no connection with the matter in controversy." *Id.*; *see also Bannister v. Wal-Mart Stores E., L.P.*, 843 F. Supp. 2d 610, 615 (E.D.N.C. 2012) ("[T]he deference given to a plaintiff's choice of forum is proportionate to the relationship between the forum and the cause of action."); *Mamani*, 547 F. Supp. 2d at 473 ("[A] court need not accord the choice as much weight when the 'forum has no connection with the matter in controversy.'") (citation omitted); *Bd. of Trustees v. Sullivant Ave. Properties, LLC*, 508 F. Supp. 2d 473, 477 (E.D. Va. 2007) (observing that the weight of plaintiff's choice of forum "varies depending on the significance of the contacts between the venue chosen by Plaintiff and the underlying cause of action").

Defendants maintain that the Court should not afford substantial weight to Capitol's choice of forum because the issues raised in the suit have little connection to Maryland. ECF 43-1 at 16. According to defendants, Capitol "alleges that Defendants have been interfering with CPS's merchant relationships, and *all of those merchants are located either in New York or New Jersey*." *Id.* at 16 (emphasis in ECF 43-1); *see* ECF 43-5, ¶¶ 12-13. Indeed, in his Declaration of March 31, 2016, Di Donato averred, ECF 43-5, ¶ 12:

> [A]ll services provided by Pinnacle under the Agreement have been rendered in the states of New Jersey and New York. All merchants I have solicited on behalf of CPS are located either in New Jersey or New York, and all merchants that ultimately executed Merchant Agreements with CPS as a result of my efforts are located either in New Jersey or New York.

Further, Di Donato asserts that each of the merchants identified by Capitol in its Complaint as former accounts misappropriated by defendants "are located and conduct business in either New Jersey or New York." *Id.* ¶ 13. In addition, Pinnacle and Di Donato assert, ECF 43-1 at 16: "Defendants themselves are located in New Jersey, and all the alleged conduct giving rise to the claims in the action occurred in that state – not in Maryland."

In its Opposition, Capitol argues that its choice of forum is entitled to deference because it is a Maryland corporation with its principal place of business in Maryland. ECF 44 at 10; *see* ECF 44-1, ¶ 2 (Schoenbauer Affidavit of 3/27/16). Therefore, Capitol asserts that its election to file suit in Maryland is entitled to significant weight. ECF 44 at 10.

Moreover, Capitol contends that Maryland is "strongly connected to the controversy at issue." *Id.* To illustrate, Capitol points out that the Agreement is governed by Maryland law (*see* ECF 44-1 at 24, ¶ 17); Pinnacle returned the signed Agreement to Maryland; and Di Donato toured Capitol's offices in Maryland. ECF 44 at 10. Further, it claims that Pinnacle "has repeatedly contacted and communicated with Capitol in Maryland." *Id.*

Capitol's decision to file suit in its home district is entitled to weight. Capitol operates from Maryland, and did so during the parties' relationship. ECF 44 at 10; *see* ECF 44-1, ¶ 2. But, Maryland has relatively little connection to the merits of the underlying dispute. Rather, it appears that all of the conduct underlying the Complaint (*i.e.*, the alleged improper conduct by defendants) occurred in New Jersey and New York (ECF 43-5, ¶¶ 11-13; *see* ECF 4, ¶¶ 15-32), a fact that Capitol does not dispute. *See* ECF 44. Thus, the weight attached to Capitol's choice of forum is somewhat diminished.

## 2. Convenience of Witnesses

"Perhaps the most important factor to be considered by a court in passing on a motion to transfer is the convenience of the witnesses." *Cronos Containers, Ltd. v. Amazon Lines, Ltd.*, 121 F. Supp. 2d 461, 466 (D. Md. 2000); *accord Mamani*, 547 F. Supp. 2d at 473; *see also* 15 C. Wright & A. Miller, Fed. Practice & Procedure, § 3851 (4th ed.) ("Wright & Miller") at 253 ("The convenience of witnesses, particularly nonparty witnesses important to the resolution of the case, is often cited as the most significant factor in ruling on a motion to transfer under 28 U.S.C.A. § 1404(a)."). However, "the convenience of witnesses who are employees of a party is entitled to less weight because that party can obtain their presence at trial." Wright & Miller, § 3851 at 278.

Defendants argue that the convenience of the witnesses favors transfer to New Jersey. As an initial matter, Pinnacle and Di Donato point out that they are located in New Jersey. ECF 43-1 at 15. Furthermore, defendants argue that transfer is warranted because all of the merchants identified in the Complaint, whose interactions with the parties form the "heart of this dispute", are located in New Jersey and New York. *Id.* at 16-17; *see* ECF 43-5, ¶ 13. Pinnacle and Di Donato assert: "All of those merchants are potential witnesses, whose testimony may be needed for the adjudication of this action on the merits." ECF 43-1 at 16. And, defendants note that the District of New Jersey, sitting in Trenton, "has trial subpoena power extending into New York City, downstate New York, and into parts of Long Island." *Id.* at 16-17; *see* Fed. R. Civ. P. 45(c)(1) ("A subpoena may command a person to attend a trial, hearing, or deposition only as follows . . . (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person . . . .").

Capitol counters that the convenience of witnesses neither weighs for nor against transfer. ECF 44 at 11. It argues, *id.*: "Without question, some potential witnesses in this case are likely located in New Jersey and New York. However, other key witnesses are located in Georgia." For example, Capitol claims that it "intends to seek discovery from Priority and will likely call at least one employee or representative of Priority as a witness . . . ." ECF 44 at 11. According to Capitol, Priority is a Georgia corporation located in Alpharetta, Georgia. *Id.*; *see* ECF 44-6 (Ga. Corps. Div., Business Search). Capitol also claims that another likely witness, First Data Card Solutions, Inc., is located in Atlanta, Georgia. ECF 44 at 11; *see* ECF 44-7 (Ga. Corps. Div., Business Search).[5] And, Capitol contends: "Merchants with whom Pinnacle interfered are likely located in Florida, Michigan, Pennsylvania, and possibly elsewhere." ECF 44 at 11; *see* ECF 44-5, ¶ 6.

In my view, the convenience of witnesses favors the transfer of the case to New Jersey. As defendants point out, without objection from Capitol, *all* of the merchants identified in Capitol's Complaint are located in New York and New Jersey, and each merchant is a potential witness. Although Trenton may not be the *most convenient* forum for merchants located in northern New Jersey or New York, it is undoubtedly more convenient than Baltimore. Practically speaking, for witnesses taking the Amtrak northeast regional train from northern New Jersey or New York, Trenton is at least two hours closer than Baltimore. *See* AMTRAK, *Northeast Corridor, New York and Washington, D.C. Timetable*, *available at*: http://bit.ly/2pxpJVP (last accessed: Apr. 25, 2017).

---

[5] In its Opposition, Capitol refers to First Data Card Solutions as an LLC. ECF 44 at 6. However, the Georgia Corporations Division search (ECF 44-7) identifies First Data Card Solutions as a corporation. *Id.*

Additionally, the existence of potential witnesses in Pennsylvania, Michigan, Florida, and Georgia cuts neither for nor against transfer. With respect to the potential witnesses in Pennsylvania, plaintiff does not indicate *where* in Pennsylvania those witnesses are located. The witnesses could be located in Shrewsbury, Pennsylvania, a 40-mile drive from Baltimore, or in Morrisville, Pennsylvania, part of which is within walking distance of the U.S. Courthouse in Trenton. Moreover, as to the potential witnesses in Michigan, Florida, and Georgia, there is no reason to believe that travel from those locations to Baltimore is any more or less convenient than travel to Trenton.

In my view, the convenience of witnesses favors transfer to the District of New Jersey.

### 3. Convenience of the Parties

"A defendant moving for transfer must show both that the original forum is inconvenient for it and that the plaintiff would not be substantially inconvenienced by a transfer." Wright & Miller, § 3849 at 217. Notably, "transfer will be refused if the effect of a change of venue would be merely to shift the inconvenience from one party to the other." *Id.* at 216; *see Pinpoint IT Services, L.L.C. v. Atlas IT Export Corp.*, 812 F. Supp. 2d 710, 721 (E.D. Va. 2011) ("[A] transfer of venue that merely switches the inconvenience from one party to the other generally will be refused.").

Although the defendants point out that they are residents of New Jersey, they do not argue that the convenience of the parties justifies transfer to New Jersey. ECF 43-1 at 16-17. Rather, defendants assert that the convenience of parties factor is neutral. *See* ECF 45 at 15. In its Opposition, Capitol urges that the convenience of the parties favors a denial of the transfer, because "[t]he effect of a change of venue would be to simply shift the inconvenience from Pinnacle to Capitol." ECF 44 at 12.

The convenience of the parties factor does not favor transfer. A transfer of the case to the District of New Jersey would serve only to shift the inconvenience from defendants to Capitol.

However, I note that it does not appear that it would be any more burdensome for plaintiff to litigate in New Jersey than for defendants to litigate in Maryland. As indicated, Capitol's Maryland counsel have been admitted pro hac vice in the New Jersey Case and have participated in that case. N.J. Case, ECF 15; *see id.*, ECF 10.

### 4. Interest of Justice

A final factor for a court's consideration is whether transfer is in the interest of justice. This factor is "amorphous and somewhat subjective," and allows a court to "consider many things." Wright and Miller, § 3854 at 313-18.

In their Motion, defendants maintain that the interest of justice favors transfer because, given the pendency of the New Jersey Case, transfer would promote judicial economy, prevent inconsistent judgments, and prevent waste. ECF 43-1 at 17-18. In its Opposition, Capitol argues that the interest of justice favors maintaining the case in Maryland, because Maryland law applies to the breach of contract claim. Capital also contends that because it filed its action in Maryland before defendants filed their suit in New Jersey, transfer is not appropriate. ECF 44 at 12-16.

In their Reply, defendants argue that the choice of law clause of the Agreement does not apply to the parties' respective tort claims. ECF 45 at 14. They rely on the doctrine of *lex loci delicti*, which provides that the applicable law is that of the state in which the harm occurred. *See, e.g.*, *Proctor v. Washington Metropolitan Area Transit Authority*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010). In defendants' view, it is more likely that the law of New Jersey or New York will apply to plaintiff's tort claim. ECF 45 at 14.

### a. Applicable Law

"Familiarity with applicable law is one of the interests of justice factors." *Aphena Pharma Solutions-MD LLC v. BioZone Laboratories, Inc.*, 912 F. Supp. 2d 309, 320 (D. Md. 2012) (citing *Dicken v. United States*, 862 F. Supp. 91, 93-94 (D. Md. 1994)); *see also* Wright and Miller § 3854 at 353-54 ("In diversity of citizenship cases, in which state law provides the substantive rules of decision, it is an advantage to have that law applied by federal judges who are familiar with the governing state law.") However, "[t]his consideration is given 'significantly less weight when the case involves basic or sufficiently well-established . . . issues of state law or when there is no reason to believe that the applicable law of the forum differs markedly from the law of the proposed transferee state.'" *Topiwala v. Wessell*, WDQ-11-0543, 2012 WL 122411 at *8 (D. Md. Jan. 12, 2012) (quoting 15 Wright and Miller, § 3854) (alteration in *Topiwala*); *see, e.g.*, *Snyder v. Bertucci's Restaurant Corp.*, No. 12-5382, 2012 WL 6601384 at *5 (E.D. Pa. Dec. 18 2012) ("Federal judges are frequently called upon to apply the laws of other states, and basic tort law is not so complicated as to advocate heavily in favor of transfer."); *Citibank, N.A. v. Affinity Processing Corp.*, 248 F. Supp. 2d 172, 178 (E.D.N.Y. 2003) ("New York contract law is not overly complex so as to unduly burden the South Carolina court.").

In my view, that the Agreement calls for the application of Maryland law to the contract claim does not weigh against transfer. Plaintiff does not claim that Maryland contract law is so unique or complicated as to prevent a New Jersey judge from being able to discern it and apply it. *See Topiwala*, 2012 WL 122411 at *8. Moreover, under the principle of *lex loci delicti*, the applicable law for plaintiff's tort claim may be that of New Jersey or New York, where the alleged tortious conduct is said to have occurred. *See* ECF 4.

### b. First to File Rule and Parallel Litigation

The parties offer starkly diverging views as to the significance of the pendency of the New Jersey Case. In defendants' view, the pendency of the New Jersey Case supports the transfer of this case, to promote judicial efficiency, eliminate potential waste, and prevent the possibility of inconsistent judgments. ECF 43-1 at 17-18. In plaintiff's view, the New Jersey Case should be dismissed or transferred to this Court under the first-to-file rule. ECF 44 at 13-16.

Although the existence of related litigation in another forum and the first-to-file rule are sometimes analyzed separately, as the parties have done here, "the policies served by transfer are similar in both instances" and "both are properly considered as components of the interest of justice." *Byerson v. Equifax Info. Servs., LLC*, 467 F. Supp. 2d 627, 635 (E.D. Va. 2006). Accordingly, I shall consider the two issues together.

The first-to-file rule refers to a principle used to determine "which of two identical or substantially similar suits should proceed." *LWRC International, LLC v. Mindlab Media, LLC*, 838 F. Supp. 2d 330, 337 (D. Md. 2011). Generally, the rule affords "priority, for purposes of choosing among possible venues when parallel litigation has been instituted in separate courts, to the party who first establishes jurisdiction." *Id.*; *accord* Wright & Miller, § 3854 at 339-43 ("[W]hen two courts have concurrent jurisdiction over a dispute involving the same parties and issues, as a general proposition, the forum in which the first-filed action is lodged has priority.[1]").

Courts have recognized several exceptions to the first-to-file rule, however. For example, the transfer of the first-filed suit to the forum of a second-filed suit is appropriate where there is a "showing of a balance of convenience in favor of the second [forum]." *Learning Network, Inc.*

*v. Discovery Comms., Inc.*, 11 Fed. App'x 297, 300 (4th Cir. 2001) (citing *Ellicott Mach. Corp. v. Modern Welding Co.*, 502 F.2d 178, 180 n. 2 (4th Cir. 1974)); *see also, e.g.*, *Futurewei Techs., Inc. v. Acacia Research Corp.*, 737 F.3d 704, 708 (Fed. Cir. 2013) ("Justification for an exception [to the first-to-file rule] may be found in 'the convenience and availability of witnesses, . . . the possibility of consolidation with related litigation, or considerations relating to the real party in interest.'"); *Smithfield Packing Co. v. V. Suarez & Co.*, 857 F. Supp. 2d 581, 585 (E.D. Va. 2012) ("'The court must balance the convenience between the two actions before deciding whether application of the first-to-file rule is appropriate in a given situation.'") (citation omitted).  Moreover, courts have "refused to apply the first-filed rule when the party that files first does so with notice that the other party is about to file."  *Remington Arms Co. v. Alliant Techsystems, Inc.*, No. 1:03CV1051, 2004 WL 444574, at *3 (M.D.N.C. Feb. 25, 2004) (citing, *inter alia*, *Anheuser–Busch, Inc. v. Supreme Int'l Corp.*, 167 F.3d 417, 419 (8th Cir. 1999)); *accord Samsung Elecs. Co. v. Rambus, Inc.*, 386 F. Supp. 2d 708, 724 (E.D. Va. 2005) ("Other scenarios giving rise to exceptions to the first-to-file rule include bad faith, anticipatory suits, and forum shopping.").

In considering the "showing of convenience", courts often look to the factors considered when evaluating a motion to transfer under 28 U.S.C. § 1404(a).  *See* Wright & Miller, § 3854 at 339-43 ("Exceptions to the first-filed rule apply when the Section 1404(a) factors weigh in favor of giving priority to the second action."); *see also Wheaton Indus., Inc. v. Aalto Sci., Ltd.*, CIV. 12-6965 RMB/JS, 2013 WL 4500321, at *2 (D. N.J. Aug. 21, 2013) ("In deciding a motion to dismiss, stay, or transfer pursuant to the first-to-file rule, a court must consider the same factors applicable to a motion to transfer under § 1404(a)."); *Winterthur Int'l Am. Ins. Co. v. Bank of Montreal*, No. 02 CIV. 6889 (RCC), 2002 WL 31521102, at *3 (S.D.N.Y. Nov. 13, 2002) ("In

considering a departure from the first-filed rule based on a balance of conveniences, a court evaluates the same factors considered on a motion to transfer pursuant to 28 U.S.C. § 1404(a).").

In this case, plaintiff won the metaphorical race to the courthouse when it filed suit in a Maryland State court. But, it did not win the race to federal court. Notably, even before the summons was issued by the Maryland State court, defendants filed suit in federal court in New Jersey. Further, defendants were not served in the State case until about two weeks after they had filed suit in New Jersey. And, the federal case had been pending for about a month in the New Jersey federal court when the underlying case was removed to the federal court in Maryland.

In any event, I am of the view that the balance of convenience factors indicates that it is more convenient to litigate this case in the District of New Jersey. As discussed, the merchants identified in the Complaint (ECF 4, ¶¶ 22-23) are potential witnesses, and are all located in New Jersey and New York. *See* ECF 43-5, ¶¶ 12-13. Moreover, in his Declaration of March 31, 2016, Di Donato stated that *all* services provided by Pinnacle under the Agreement were rendered in New Jersey and New York. ECF 43-5, ¶ 12. Thus, to the extent that there are other merchants not identified in the Complaint, those parties are likely located in New Jersey or New York. And, Capitol has not contested Di Donato's assertions regarding the location of witnesses, other than to say that other potential witnesses may be in Pennsylvania, Georgia, Michigan, and Florida. ECF 44 at 11; *see* ECF 44-5, ¶ 6. Other than plaintiff (and perhaps plaintiff's employees),[6] plaintiff has no witnesses in Maryland. Given the number of potential witnesses in New Jersey and New York, the convenience of witnesses factor points strongly towards the transfer of the case to New Jersey.

---

[6] In their Reply, Pinnacle and Di Donato assert that they "do not believe that any other relevant [Capitol] employees exist, except for Mr. Schoenbaum."

To be sure, and as indicated, Capitol is entitled to some deference as to its choice of forum; it is a Maryland company that elected to file suit in its home state. But, the weight of that factor must be considered in light of the conduct giving rise to this suit, which occurred almost exclusively outside of Maryland. And, it appears that plaintiff and defendants would be equally inconvenienced by litigating outside of their home state.

Finally, although Maryland law applies to plaintiff's breach of contract claim, Capitol does not claim, with good reason, that Maryland law is so complicated or unique that a New Jersey judge would be unable to discern it and apply it. And, applying the doctrine of *lex loci delicti*, the law of New Jersey or New York would likely apply to plaintiff's claim of tortious interference.

On balance, the convenience factors point towards the transfer of the case to New Jersey. Accordingly, to the extent the first-to-file rule applies here, I decline to adhere to it. *See Learning Network, Inc.*, 11 F. App'x at 300.[7]

I turn to defendants' argument that the transfer of the case to the District of New Jersey will promote judicial economy, prevent waste, and avoid the risk of inconsistent judgments.

"A significant factor in considering the interests of justice is 'avoiding duplicative litigation in courts,' and the Court 'may appropriately consider the conservation of judicial resources and comprehensive disposition of litigation.'" *Mamani*, 547 F. Supp. 2d at 474 (quoting *Cronos Containers, Ltd.*, 121 F. Supp. 2d at 466); *see also* Wright & Miller, § 3854 ("[M]any courts have transferred to a forum in which other actions arising from the same transaction or event, or which were otherwise related, were pending."). When a similar case is

---

[7] Defendants have advanced other arguments supporting their position that the first-to-file rule should not be applied in this case. *See* ECF 43-1 at 18-23; ECF 45 at 4-10. In light of my disposition, I need not address these contentions.

already pending in another district, transfer of related claims is "favored" because it "may facilitate efficient pretrial proceedings and discovery" and also "because it avoids inconsistent results." *D2L*, 671 F. Supp. 2d at 783. Moreover, there is "judicial economy in having the same judge consider the same underlying facts and issues only once . . . ." *U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd.*, 357 F. Supp. 2d 924, 939 (E.D. Va. 2005).

What the Supreme Court said in *Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 26 (1960), is pertinent here, *id.*: "[A] situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that [§] 1404(a) was designed to prevent." *See also D2L Ltd.*, *supra*, 671 F. Supp. 2d at 783 ("The interest of justice weighs heavily in favor of transfer when a related action is pending in the transferee forum.").

Here, there can be little doubt that the New Jersey case and the case *sub judice* are part and parcel of the same dispute and are two sides of the same coin. *See generally*, N.J. Case, ECF 18 (noting that the two cases involve "substantially the same parties and dispute"). Although the parties disagree as to who is to blame for the breakdown of the Agreement in January 2016, what is clear is that the litigation here and in New Jersey centers on that implosion. ECF 4, ¶¶ 15-32; ECF 1 in N.J., ¶¶ 24-33. Accordingly, it will promote judicial economy, conserve the parties' resources, and reduce the burden on potential witnesses to have one court resolve both cases. Moreover, in light of the common factual and legal issues, there is a risk of inconsistent judgments if the two cases proceed in two fora before two finders of fact.

For the reasons stated above, the pendency of the New Jersey Case supports the transfer of the case to the District of New Jersey.

## IV.    Conclusion

In my view, the balance of factors strongly supports the transfer of this case to the District of New Jersey.  Therefore, I shall GRANT the Motion (ECF 43).

An Order follows, consistent with this Memorandum Opinion.

Date:   May 23, 2017

_____/s/_____
Ellen Lipton Hollander
United States District Judge